**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ANITA SHUNTA LEE, o/b/o B.G.S.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO. 11-00615-B** |
| | * | |
| **CAROLYN W. COLVIN,**[1] | * | |
| **Commissioner of Social Security,** | * | |
| | * | |
| **Defendant.** | * | |

<u>**ORDER**</u>

Plaintiff, Anita Shunta Lee ("Plaintiff"), brings this action on behalf of her minor child, B.G.S.,[2] seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability and child supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.* ("SSI").  On October 12, 2012, the parties consented to have the undersigned conduct any and all proceedings in this case.  (Doc. 17).  Thus, this case was referred to the undersigned to conduct all proceedings through entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. 20).  Oral argument was waived.  Upon careful consideration of the administrative record and the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), <u>Federal Rules of Civil Procedure</u>, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Pursuant to the E-Government Act of 2002, as amended on August 2, 2002, the Court has redacted the minor child's name throughout this opinion and refers to him only by his initials, "B.G.S."

memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

## I.    Procedural History

Plaintiff protectively filed an application for supplemental security income benefits on behalf of her son B.G.S. on December 6, 2007.  (Tr. 58, 114).  Plaintiff alleges that B.G.S. has been disabled since March 1, 2000, due to attention deficit hyperactivity disorder (ADHD) and borderline intellectual functioning.  (Id.).  Plaintiff's application was denied at the initial stage, and she filed a timely Request for Hearing before an Administrative Law Judge on April 11, 2008.  (Id. at 58, 82).   On August 26, 2009, Administrative Law Judge Linda J. Helm (hereinafter "ALJ") held an administrative hearing, which was attended by Plaintiff, her son B.G.S., Plaintiff's attorney, Gary Stout, and a vocational expert ("VE").  (Id. at 36).   On September 29, 2009, the ALJ issued an unfavorable decision finding that B.G.S. is not disabled.  (Id. at 31).   Plaintiff's request for review was denied by the Appeals Council ("AC") on September 7, 2011.  (Id. at 1).

The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    Issue on Appeal

A.    Whether the ALJ erred in rejecting the opinion of B.G.S.' treating
physician?

## III.    Factual Background

Born on March 2, 1993, B.G.S. was 16 years old at the time of the hearing.  (Tr. at 39).  At that time, he had been diagnosed with attention-deficit hyperactivity disorder (ADHD), conduct disorder, borderline intellectual functioning, and adjustment disorder with mild depression.  (Tr. at 39, 114, 153, 289, 291).  B.G.S.  attended Compass Academy, an alternative

school for children with behavioral problems, for two years, and at the August 26, 2009 administrative hearing, his mother reported that he had not been in school since the preceding April.  (Id. at 46, 47, 54).  B.G.S. testified that his mother took him out of Compass Academy because he was "cutting school."  (Tr. at 41).  His mother testified, however, that Compass Academy "released" him from the program because they could no longer help him.  (Id. at 54-55).  Both B.G.S. and his mother testified that the Conecuh County School Board would not allow him to attend public school because of "his past in that school system." (Tr. at 41, 55).

B.G.S. testified that he works with his uncle every day for five or six hours in his produce stand, selling produce and carrying bags to customers' vehicles.  (Id. at 42-43).  B.G.S. stated that he takes medication for his "behavior" and "attitude" and that the medications help.  (Id. at 44).  According to B.G.S., when he does not take his medications, he "get[s] hyper."  (Id.).  He testified that he is thinking about joining the Navy and that he is trying to get back in school so that he can finish his high school degree.  (Id. at 44-45).  He also testified that he has not been in trouble with the law[3] and that he does not have problems with drugs or alcohol.  (Id. at 45).

At the hearing, B.G.S.'s mother testified that he has had behavioral problems since age six.  She stated that he has problems with his speech, reading, and understanding, and these problems make him irritated and annoyed, and as a result,  he might push a desk, knock paper on the floor, or start crying.  (Id. at 49).   He is currently taking Concerta (for ADHD) and Lexapro (for depression), and the medications help.  (Id. at 50-51).

## IV.    Analysis

---

[3] B.G.S.' mother testified that he was required to go to boot camp after he wrote on a wall at school but that boot camp was  not ordered by the courts.  (Tr. at 55).  B.G.S.'s medical records reflect that notwithstanding B.G.S.'s testimony, he has been arrested three times.  (Id. at 255, 289).

### A.      Standard Of Review

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[4]  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").   In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. 1999).

### B. Childhood Disability Law

The Personal Responsibility and Work Opportunity Act of 1996, which amended the statutory standard for children seeking supplemental security income benefits based on disability, became effective on August 22, 1996.  See Pub. L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. § 1382c).  The definition of "disabled" for children is:

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable

---

[4] This Court's review of the Commissioner's application of legal principles is plenary.  See Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

> physical or mental impairment, which results in marked and severe
> functional limitations, and which can be expected to result in death
> or which has lasted or can be expected to last for a continuous
> period of not less than 12 months.

See 42 U.S.C. § 1382c(a)(3)(C)(i), 20 C.F.R. § 416.906.[5]  The regulations provide a three-step sequential evaluation process for determining childhood disability claims.   20 C.F.R. § 416.924(a).

At step one, a child's age/work activity, if any, are identified to determine if he has engaged in substantial gainful activity.  At step two, the child's physical/mental impairments are examined to see if he has an impairment or combination of impairments that is severe.  Under the regulations, a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations."  20 C.F.R. § 416.924(c).  To the extent the child is determined to have a severe impairment, at step three, the Commissioner must then determine whether the impairment or combination of impairments meets or is medically or functionally equal to an impairment listed in Appendix 1 of 20 C.F.R. part 404, subpart P, and otherwise satisfies the duration requirement.[6]  20 CFR § 416.924.

A child's impairment(s) meets the listings' limitations if he actually suffers from limitations specified in the listings for his severe impairment.   Shinn ex rel. Shinn v. Commissioner of Soc. Sec., 391 F.3d 1276, 1279 (11th Cir. 2004).   A child's impairment(s) medically equals the listings if his limitations are at least of equal severity and duration to the

---

[5]  On September 11, 2000, the Commissioner published Final Rules for determining disability for a child under the age of 18.  See 65 Fed. Reg. 54,747, corrected by 65 Fed. Reg. 80,307. These rules became effective on January 2, 2001, and apply to Plaintiff's claim.  See 65 Fed. Reg. at 54,751.

[6]  In making this determination the ALJ considers the combined effect of all medically determinable impairments, even those that are not severe.  See 20 CFR 416.923, 416.924a(b)(4), and 416.926a(a) and (c).

listed impairment(s).   Id. (citing 20 CFR § 416.926).   Where a child's impairment or combination of impairments does not meet or medically equal any listing, then the Commissioner must determine whether the impairment or combination of impairments results in limitations that functionally equal the listings.[7]   20 CFR § 416.926a.   To establish functional equivalence in step 3, the claimant must have a medically determinable impairment or combination of impairments that results in marked limitations in two functional domains or an extreme limitation in one domain.   20 CFR § 416.926a(a).   The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating to others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.   20 CFR 416.926a.

C.   **Discussion**

**1. ALJ's Decision**

In this action, the ALJ issued an unfavorable decision on September 29, 2009.  (Tr. 31). After setting forth the sequential evaluation process for evaluating child disability claims, the ALJ determined that B.G.S. has not engaged in substantial gainful activity and that, while he has the severe[8] impairments of borderline intellectual functioning, attention deficit hyperactivity disorder (ADHD) and conduct disorder, they do not meet, medically equal, or functionally equal

---

[7] In making this assessment, the reports of the State Agency medical consultants, reports of other treating, examining, and non-examining medical sources, and the claimant's symptoms, including pain and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, are all taken into consideration.  20 C.F.R. §§ 416.927, 416.929; and SSR 96-5, 96-6p and 96-7p.

[8] The ALJ also considered the cumulative effects of all of B.G.S.'s impairments, including his non-severe diagnoses of adjustment disorder with mild depression and Osgood Schlatter disease (a painful swelling of the anterior tibial tubercleon on the upper part of the shinbone).  (Tr. at 18, 20).  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002238/.

the criteria for any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  (Id. at 16-21).

With respect to the functional equivalence domains, the ALJ found that B.G.S. has "less than marked" limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.  (Id. at 26-27).  The ALJ further found that B.G.S. has "no limitation" in moving about and manipulating objects, caring for oneself, and health and physical well-being.  (Id. at 28-30).  Accordingly, the ALJ concluded that, because B.G.S. does not meet or medically equal any of listings set forth in 20 CFR Part 404, Subpart P, Appendix 1, nor does he functionally equal the listings by having an impairment or combination of impairments that results in either "marked"[9] limitations in two domains of functioning or "extreme" limitation in one domain of functioning, he is not disabled under the Act.  (Id. at 23, 31).

### 2. Record Evidence

#### a. Academic Evidence

On October 18, 2006, B.G.S. began attending Compass Academy, an alternative school for children with behavioral problems operated by Southwest Alabama Mental Health.  (Id. at 54, 158, 225, 280).  B.G.S.  enrolled in Compass Academy after getting in trouble at his previous school and being arrested for disorderly conduct.  (Id. at 255).  While at Compass Academy, B.G.S. was diagnosed with ADHD and adjustment disorder with mild depression.  (Id. at 153).

---

[9]  Social Security regulation 20 CFR 416.926a(e)(2) explains that a child has a "marked limitation" in a domain when his impairment(s) "interferes seriously" with his ability to independently initiate, sustain or complete activities.  It means "more than moderate" but "less than extreme."  Id.  By way of contrast, an "extreme" limitation "interferes very seriously" with the child's ability to independently initiate, sustain, or complete activities." 20 CFR 416.926a(e)(3).  It is the rating given to the "worst limitations."  Id.

His school records dated October 17, 2006 reflect goals of improving B.G.S.'s behavior, increasing his appropriate expression of thoughts and feelings, and improving his basic living skills.  (Id. at 155).  The barriers to his goals were identified as attitude, not following directions, and "hold[ing] some things in."  (Id. at 154).

On February 28, 2008, the Compass Academy Coordinator, Elizabeth Godwin, completed a questionnaire in which she stated that B.G.S. "sometimes needs extra assistance to stay on task," that he is easily distracted, that he does better with structured activities, that he gets easily frustrated and adopts an "I don't care" attitude, that he gets upset easily with others, that his anger quickly turns to sadness at times, and that he has been sent to the office numerous times for disrespecting staff.  (Id. at 167-73).    With regard to B.G.S.'s ability to function, Ms. Godwin opined that in the domain of acquiring and using information, B.G.S. had no problem or only a "slight problem" in the listed activities.  (Id. at 168).  With respect to the domain of attending and completing tasks, Ms. Godwin opined that B.G.S. had a very serious problem with completing his work accurately without careless mistakes and had a serious problem with sustaining attention during play/sports activities, completing class and homework assignments, and working without distracting himself or others.  (Id. at 169).  She further opined that in other areas within the domain, such as carrying out single-step instructions, B.G.S. had no problem, and only a slight problem carrying out multi-step instructions, paying attention when spoken to directly, changing from one activity to another without being disruptive, and organizing his own things or school materials. (Id.).  With respect to the domain of interacting and relating with others, Ms. Godwin indicated that B.G.S. had a very serious problem expressing anger appropriately and that he had a serious problem  playing cooperatively with other children and following rules.  (Id. at 170).  She found, however, that he had no problem, a slight problem, or

an obvious (but not serious) problem with respect to the remaining ten activities in that domain, such as asking permission appropriately.  (Id. at 170, 174).  With respect to the domain of caring for himself, Ms. Godwin opined that B.G.S. had a very serious problem with handling frustration appropriately, being patient when necessary, identifying emotional needs, responding appropriately to changes in his own mood, using appropriate coping skills to meet the daily demands of school, and knowing when to ask for help.  (Id. at 171).  She also found that B.G.S. had no problem taking care of personal hygiene.  (Id.).  With respect to the domain of moving about and manipulating objects, Ms. Godwin found "no problems."  (Id. at 174).  She also noted that B.G.S. was grieving and suffering from depression after losing both of his grandfathers in the preceding six months but that his medications made him "able to control [his] moods better." (Id. at 172).

The records also document instances in which B.G.S. was disciplined for school rule violations.  On February 22, 2008, he received a major rule violation for malingering, and on February 29, 2008, he received a major rule violation for failure to follow directions/arguing with staff.[10]  (Id. at 206, 280).  On August 15, 2008, he received a "disciplinary" for "horseplay, assault," and on October 31, 2008, he received a disciplinary for "AWOL, disrespecting staff, profanity, malingering, [and] failure to follow directions."  (Id. at 228, 231).  In addition, B.G.S.'s daily orientation sheets reflect a system of check marks for good behavior ("go" marks), and bad behavior ("no go" marks).  While there are instances of "no go" marks for behavior such as being disruptive, being out of uniform, failing to follow directions, and disrespecting the staff, the vast majority of marks are "go" marks.  (Id. at 300-301, 303, 307-09).

The records also reflect that during the two years that B.G.S. attended Compass

---

[10] It was also noted that he had a negative number of days earned in the program.  (Tr. at 207).

Academy, his grades varied from semester to semester.  For example, in October 2006 when he started, B.G.S. had A's in Geography, PE, and Life Skills, a B in Science, and an incomplete in English.  (Id. at 158).  In March 2007, he had A's in PE and Life Skills, a B in Math, a C in Civics, a D in Science, and an incomplete in English.  (Id.).  In May of 2007, he had A's in PE and Life Skills, B's in Math and Science, an incomplete in Civics, a D in Literature, and an F in English.  (Id. at 158).  In the summer of 2007, he had all A's in Civics, English, PE, and Life Skills.  (Id. at 158).  In October 2007, he had A's in PE and Basic Skills, a B in Math, a C in Science, and D's in Reading/English and Social Studies.  (Id. at 156).  In December 2007, B.G.S. had incompletes in all subjects.[11]  (Id. at 157).  Notwithstanding the fluctuations in his grades, in February 2008, Ms. Godwin noted that B.G.S. was working on grade level (eighth grade) in math, reading, and language.[12]  (Id. at 167).

The record reflects that B.G.S. withdrew from Compass Academy in April 2009 when he was in the ninth grade,[13] although, as noted above, it is unclear whether the withdrawal was voluntary.  (Id. at 41, 336).  At the administrative hearing conducted on August 26, 2009, B.G.S. testified that he wants to join the Navy and that he is trying to get back in school to obtain his high school diploma.  (Id. at 44-45).  Both B.G.S. and his mother testified that his medications

---

[11] Although the record does not contain any reports of B.G.S.'s grades after December 2007, Dr. West's January and February 2008 treatment records reflect that B.G.S.'s "[g]rades are good." (Id. at 330-31).  In March 2008, Dr. West noted that B.G.S.'s  grades "just recently started falling and he is getting in a lot of trouble again."  (Id. at 330).  In April and May of 2008, Dr. West noted that B.G.S. was "doing well" and "not having any problems."  (Id. at 329).

[12] The record shows that B.G.S. repeated the first grade.  (Tr. at 289).

[13] B.G.S. would have been in the tenth grade in August 2009.  (Tr. at 41-42).  At a hearing conducted on August 6, 2009, the Conecuh County Board of Education denied B.G.S. re-admission to Conecuh County schools.  The Board "encourage[d]" B.G.S.'s mother "to seek alternative schooling for [B.G.S.]" or enroll him "in the GED program at Reid State College" and offered their assistance in helping him get in school.  (Id. at 237).

were helping with his behavior, attitude, and depression.[14]  (Id. at 44, 50-51).

### b. Medical Evidence

The relevant medical evidence of record shows that B.G.S. began receiving outpatient therapy from Southwest Alabama Mental Health ("SAMH") some time in late 2004, when he was eleven years old and in the fifth grade.  (Id. at 166).  On December 7, 2004, B.G.S. was seen by a nurse practitioner at SAMH for a follow up visit and evaluation of his medications.[15]  (Id.). B.G.S.'s mother reported that he was "[d]oing good so far" and that he does well "as long as he's medicated."  (Id.).  In addition, the nurse practitioner noted that his mood was "good," that he was alert, oriented, and cooperative, that his affect was appropriate, that his grooming was good, that his speech, thought process, insight, and judgment were normal, that he was having no delusions or suicidal thoughts, and that his appetite and sleep were good.  (Id.).  She continued his medications according to previous orders.  (Id.).  On March 1, 2005, B.G.S. returned for a follow up visit and his mother reported that he was "doing good" in school and had no problems to report.  (Id. at 165).  The nurse practitioner noted that his mood was "improved," and she continued his treatment with medication.  (Id.).

On August 21, 2006, when B.G.S. was thirteen years old, he was seen by Dr. Stephen West at Barnes Family Medical Associates for a refill of his ADHD/ADD medication.[16]  (Id. at 252).  B.G.S.'s physical examination was normal, and Dr. West refilled his prescriptions for

---

[14] B.G.S.'s mother testified that when the doctor increased his ADHD medication, "it helped a whole lot."  (Tr. at 51).

[15] The record does not reflect which medications B.G.S. was taking at the time.

[16] The record reflects that B.G.S. has been treated by Dr. West since at least August 1998.  (Tr. 250).

Metadate and Lexapro.[17]   (Id.).   Dr. West noted, "there is some question about him having

problems with it wearing off in the afternoon and we will just have to see how he does."   (Id.).

On September 21, 2006, B.G.S. returned for a refill of his medication, and Dr. West noted that

the Metadate "has absolutely done wonderful (sic)."   (Id. at 253).   On October 18, 2006, the

same day that B.G.S. began attending Compass Academy, Dr. West noted, "[t]he child has been

doing well other than his ADD and depression."[18]   (Id. at 158, 256).   Dr. West conducted an

EPSDT screening[19] on this date and noted that B.G.S. shows self-confidence and pride in school,

has a few friends, participates in group activities, understands and complies with rules at home,

and communicates and interacts with the physician.   (Id. at 254).   From November 2006 through

---

[17] Metadate (or Methylphenidate) is in a class of medications called central nervous system stimulants and is used to control symptoms of attention deficit hyperactivity disorder (ADHD). See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html. Lexapro (or Escitalo-pram) is an antidepressant.   See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html.

[18] In addition to seeing Dr. West, B.G.S. was receiving mental health treatment from SAMH at this time.   His records from SAMH dated October 31, 2006, show that he had a GAF score of 60. (Tr. at 153).   GAF (Global Assessment of Functioning) is a numeric scale (0 through 100) used by mental health clinicians that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum.   A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious social dysfunction (e.g., no friends, unable to keep a job).   A GAF score of 51-60 suggests moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). A GAF score of 61-70 is indicative of mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  See http://www.gafscore. com/.

[19] The EPSDT (Early and Periodic Screening, Diagnosis, and Treatment) program is a mandatory set of medical services and benefits for all individuals under age twenty-one who are enrolled in Medicaid.   See http://mchb.hrsa.gov/epsdt/overview.html.   The purpose of the EPSDT program is "to discover, as early as possible, the ills that handicap . . . children and to provide continuing follow up and treatment so that handicaps do not go neglected."   Id. (internal quotation marks omitted).

January 2007, Dr. West noted that the medicine was "absolutely working great," that B.G.S. was not having any problems at school, that his grades were improving, and that he was "feeling a lot better." (Id. at 256, 258).

On March 7, 2007, when B.G.S was fourteen years old, he was examined by Dr. Lorna Bland, a psychiatrist at SAMH. Dr. Bland diagnosed B.G.S. with oppositional defiant disorder ("ODD") and post-traumatic stress disorder ("PTSD"). (Id. at 163). At the time, B.G.S.'s mother reported that B.G.S. was having problems at the Compass School and was talking about killing himself. (Id.). Dr. Bland's notes reflect that B.G.S. was alert, cooperative, and oriented. The notes also reflect that B.G.S. had no perceptual disturbances, had good grooming, and his speech, reaction time, thought process, insight, and judgment were normal. B.G.S. was not having any delusions, suicidal thoughts, homicidal thoughts, or obsessions. His appetite was good, and his sleep was fair. (Id.). During his therapy session, B.G.S. told Dr. Bland that he had nine more weeks added to his program at the Compass School "for talking out in class" and that he felt guilty about this. (Id. at 164). He also told Dr. Bland that "he really doesn't want to die." (Id.). Dr. Bland formulated a treatment plan which included counseling and a continuation of his medication therapy. (Id. at 163).

On March 28, 2007, B.G.S.'s mother reported to Dr. Bland that he was not having any problems. (Id. at 162). Dr. Bland observed that B.G.S. "smiles easily," that his grooming was good, that his speech, reaction time, thought process, insight, and judgment were normal, that his appetite was fair, and that his sleep was good. (Id.). B.G.S. reported that he was not having any thoughts about killing himself and that he was trying to stop thinking about all the people that he knows dying. (Id.). He also reported wanting to go to the Navy. (Id.).

On March 29, 2007, B.G.S. returned to Dr. West for a follow up visit. Dr. West's notes

reflect that "[h]e is doing fairly well" and that his "grades are better." (Id. at 259). From May through July of 2007, Dr. West continued to note that B.G.S. was "doing well" on his medications, although he had become "over sedated" on Metadate and was sleeping during class. (Id. at 259-60). Dr. West discontinued the Metadate, prescribed Adderall, and continued the Lexapro. (Id. at 259). In Dr. West's treatment notes for June and July of 2007, he noted that B.G.S.'s medications were working "wonderful[ly]," that he was "more outgoing," that he was "not depressed at all," that his "grades have been great,"[20] that he is doing well in school, and that he is not having any problems. (Id. at 260). In the treatment notes for the period September through November of 2007, Dr. West noted that B.G.S. was having "a lot of problems at the Compass School with his attitude"[21] but that his grades were doing "good." (Id. at 261). He also noted that the Lexapro was controlling B.G.S.'s depression. (Id. at 263). In January and February of 2008, Dr. West noted that B.G.S. was "doing really well," that his "[g]rades [were] good," that the medicine was helping, and that B.G.S. stated that "things are going great and he is doing great." (Id. at 330-31).

On March 16, 2008, when B.G.S. was fifteen years old and in the eighth grade at Compass Academy, Dr. W.G. Brantley conducted a consultative mental examination for the Agency. (Id. at 289). Dr. Brantley found that B.G.S. had a full scale IQ of 71 on the WISC III scale and that his adaptive skills were much higher than his cognitive skills. (Id. at 289-90). Dr. Brantley found no evidence of anxiety or depression and noted that B.G.S. reported that

---

[20] B.G.S.'s school records from Compass Academy at this time show that he had all A's in Civics, English, PE, and Life Skills. (Tr. at 158).

[21] B.G.S.'s records from SAMH dated October 1, 2007, show that he had a GAF score of 45, which indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious social dysfunction (e.g., no friends, unable to keep a job). See http://www.gafscore.com/. (Tr. at 276).

"'[g]ood' is how he feels most days." (Id. at 290). Dr. Brantley detected no fidgeting or hyperactive talk and found that B.G.S.'s concentration, attention, memory, and fund of information were normal and that his understanding and thought processing were consistent with a borderline IQ. (Id.). He observed no psychomotor agitation or retardation, no flight of ideas or loose association, no distractibility, and no impulsivity or hyperactivity. (Id.). He found B.G.S. to be medication compliant with no ADHD features which were not controlled. (Id.). He noted that B.G.S. spends time with his peer group, plays basketball, attends church, sings in the choir, enjoys football, and helps his mother with chores, although his mother reported that he does require some degree of legal supervision because he "associate[es] with gang members," which has led to "some juvenile legal indiscretions," arrests, and probation.[22] (Id. at 290-91). Based on his findings, Dr. Brantley concluded that B.G.S. had a residual minimal expressive language disorder,[23] conduct disorder, ADHD in full remission, and borderline intellectual functioning. (Id. at 291). Dr. Brantley set forth the following prognosis: "Difficult to predict. He is cognitively and emotionally stable, but has behavioral problems related to a Conduct Disorder and is on probation. He certainly will benefit from continued schooling and eventual vocational training. Cooperation was excellent." (Id.).

The record reflects that on March 31, 2008, B.G.S. was seen by Dr. West, who noted that B.G.S. was "still having a lot of problems with his grades and they just recently started falling and he is getting in a lot of trouble again. He has also had to go to a detention center a couple of times." (Id. at 330). In April and May of 2008, Dr. West's notes reflect that B.G.S. had no signs

---

[22] Dr. Brantley noted that B.G.S. had been arrested three times and was under juvenile probation in Conecuh County. (Tr. at 289).

[23] B.G.S. was in speech therapy until the fourth grade. (Tr. at 290).

of depression or fatigue, that he was outgoing, that the Lexapro was working, that he had been experiencing no suicidal or homicidal ideations, and that B.G.S. stated that he was doing well and not having any problems.  (Id. at 329).

On April 1, 2008, State Agency medical and psychological consultants, Francis W. Sullivan, M.D., and Donald Hinton, Ph.D., reviewed B.G.S.'s records and completed a childhood disability evaluation.  They opined that even with his impairments of ADHD, depression, borderline intellectual functioning, conduct disorder, and adjustment disorder with mild depression, B.G.S. has "less than marked" limitations or "no limitation" in the six domains of functioning.  (Id. at 292-95).

On June 16, 2008, Dr. West completed a childhood disability evaluation form and opined that B.G.S.'s ADHD[24] has caused "marked" impairments in the domains of acquiring and using information and attending and completing tasks.  (Id. at 319).  Dr. West opined that B.G.S. had only "mild" impairments in the domains of interacting and relating with others and moving about and manipulating objects and a "moderate" impairment in the domain of health and physical well-being.  (Id.).

In a report dated the following day, June 17, 2008, Ms. Godwin, who had been B.G.S.'s therapist at SAMH for almost two years, observed that despite his diagnoses of ADHD and adjustment disorder with mild depression, B.G.S. "does well with the medicine prescribed by his primary doctor" and "continues to work on his impulse control, decision making, and expressing feelings and thoughts in appropriate ways."  (Id. at 205).  She further noted that B.G.S. "does still struggle with his attitude and behavior *on occasion*" and that he would remain at Compass Academy for several more months.  (Id.) (emphasis added).

---

[24] Dr. West based his opinion on the impairment of ADHD.  (Tr. at 320).

On June 30, 2008, B.G.S. saw Dr. West for a follow up visit.  Dr. West's notes reflect that B.G.S. was "having a lot of anger issues from where he is in compass school.  He wants to go ahead and be referred to a psychiatrist."  (Id. at 327).  Dr. West refilled B.G.S.'s prescriptions for Adderall and Lexapro and referred him to a psychiatrist.  (Id.).  On February 10, 2009, when B.G.S. was almost sixteen years old, Dr. West conducted another EPSDT screening which he found to be "[a]bnormal . . . secondary to ADD and behavioral problems."  (Id. at 335).  Dr. West noted that B.G.S. was "still having a lot of problems with behavior and . . . still seeing the pediatric psychiatrist for his ADD."  (Id.).

On July 7, 2009, B.G.S. returned to SAMH for medication monitoring and follow up. The nurse's note reflects that B.G.S.'s mother reported no problems and stated that he "is much better" since she took him out of  the Compass School.  (Id. at 336).  The nurse's notes also reflect that B.G.S. was alert, cooperative, and oriented, that his grooming was good, that his speech, reaction time, thought process, mood, insight, and judgment were normal, that he had no suicidal thoughts or delusions, and that his appetite and sleep were good.  (Id.).  In addition, the psychiatrist[25] who treated B.G.S. noted that "there continues to be conflict" between B.G.S.'s mother and Compass School.  (Id.).  The psychiatrist further noted, "[B.G.S.] continues to grow appropriately.  His mom says he has a better attitude and has been more respectful so she never had to start Lexapro."  (Id.).  The psychiatrist discontinued Prozac, continued Concerta, and instructed B.G.S. to return in two to three months.  (Id.).  On August 26, 2009, B.G.S. and his mother testified at his administrative hearing that he is still taking Concerta and Lexapro for his "behavior" and "attitude" and that the medications are helping.  (Id. at 44, 50-51).

---

[25] The name of the treating physician on this date is illegible.  (Tr. at 336).

3.      **Whether the ALJ erred in rejecting the opinion of B.G.S.'s treating physician?**

In her brief, Plaintiff argues that the ALJ erred in failing to properly consider the opinion of B.G.S.'s treating physician, Dr. West, that B.G.S. has "marked" limitations in the domains of acquiring and using information and attending and completing tasks.  (Doc. 14 at 4).  Plaintiff maintains that the ALJ failed to consider the nature and extent of the treating relationship between B.G.S. and Dr. West, as well as the length of time of the relationship.  (Id.).   Contrary to Plaintiff's assertion, the record reflects that the ALJ found Dr. West's treatment records to be persuasive and assigned them significant evidentiary weight.  The ALJ declined however to accord determinative or controlling weight to the opinions contained in Dr. West's June 16, 2008 childhood disability evaluation because she found the opinions to be inconsistent with Dr. West's own treatment records, as well as B.G.S.'s school records and the remaining medical evidence in the case.  (Tr. at 22).

"It is well-established that the testimony of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary." Crawford v. Commissioner of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (citations and internal quotations omitted). However, the ALJ may discount the treating physician's report where it is not accompanied by objective medical evidence, is wholly conclusory, or is contradicted by the physician's own record or other objective medical evidence.  Id.; see also Green v. Social Sec. Admin., 223 Fed. Appx. 915, 922-23 (11th Cir. 2007) (unpublished) (ALJ had good cause to devalue a treating physician's opinion where it was inconsistent with the medical evidence and plaintiff's testimony).  "When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the: (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment

relationship; (3) the medical evidence and explanation supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the pertinent medical issues; and (6) other factors that tend to support or contradict the opinion." Weekley v. Commissioner of Soc. Sec., 486 Fed. Appx. 806, 808 (11th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)). Although the ALJ must evaluate the treating physician's opinion "in light of the other evidence presented," "the ultimate determination of disability is reserved for the ALJ." Green, 223 Fed. Appx. at 922-23 (citing 20 C.F.R. §§ 404.1513, 404.1527, 404.1545)).

The evidence in the present case shows that while B.G.S. had a lengthy doctor-patient relationship with Dr. West, which included regular treatment for ADHD, depression, and various other childhood ailments, Dr. West's opinion that B.G.S.'s ADHD caused "marked" limitations in the domains of acquiring and using information and attending and completing tasks is unsupported by his own treatment records and the record as a whole. From 2006 to 2009, Dr. West prescribed either Metadate, Adderall, or Lexapro for B.G.S.'s ADHD and depression, and his treatment notes are replete with comments that B.G.S. was doing "well," "great," and "wonderful[ly]" on his medication. (Id. at 253, 256, 258-60, 330-31). Dr. West also conducted periodic EPSDT screenings and, with one exception in February 2009 (id. at 335), he noted that B.G.S. shows self-confidence and pride in school, has friends, participates in group activities, understands and complies with rules at home, and communicates and interacts with the physician. (Id. at 254, 262). Likewise, the vast majority of Dr. West's office notes reflect that B.G.S. was not having problems at school, that his grades were "good," and that he was "feeling a lot better." (Id. at 256, 258-60, 329-31). Although there are references in the record to B.G.S. having behavioral or school performance problems, those instances are the exception, not the rule. (Id. at 261, 330, 335). When considered *in toto*, Dr. West's opinion that B.G.S.'s ADHD

left him with "marked" impairments in his ability to acquire and use information and in his ability to attend and complete tasks is not supported by his own treatment records.

Dr. West's opinion is also inconsistent with the remaining medical evidence in the case, including the opinion of consultative examining psychologist, Dr. Brantley, who opined that although B.G.S. has an IQ of 71, his adaptive skills are much higher than his cognitive skills, and his concentration, attention, memory, and fund of information are normal. (Id. at 290). Dr. Brantley also found B.G.S. to be medication compliant, with no ADHD features which were not controlled, and found no evidence of anxiety or depression. (Id. at 289-90). Dr. Brantley stated that B.G.S.'s understanding and thought processing were consistent with his IQ. (Id. at 290). B.G.S. told Dr. Brantley that "[g]ood" is how he feels most days. (Id. at 290). Although Dr. Brantley opined that B.G.S.'s prognosis was "difficult to predict," he explained that B.G.S. "is cognitively and emotionally stable, but has behavioral problems related to a Conduct Disorder[.]" (Id. at 291). Dr. Brantley opined that B.G.S. would "certainly . . . benefit from continued schooling and eventual vocational training," noting that B.G.S.'s "[c]ooperation was excellent." (Id.).

Similarly, Dr. West's opinion is inconsistent with that of SAMH therapist Elizabeth Godwin that B.G.S. has no more than a "slight problem" with respect to the domain of acquiring and using information and that he has a serious or a very serious problem with only four (out of thirteen) activities listed under the domain of attending and completing tasks. (Id. at 168-69). In addition, Dr. West's opinion is inconsistent with the opinions of State Agency medical and psychological consultants, Francis W. Sullivan, M.D., and Donald Hinton, Ph.D., who concluded that, even with the impairments of ADHD, depression, borderline intellectual functioning, conduct disorder, and adjustment disorder with mild depression, B.G.S. has "less than marked"

limitations in the domains of acquiring and using information and attending and completing tasks.  (Id. at 294).

Finally, Dr. West's opinion is inconsistent with B.G.S.'s school records and the evidence of his activities of daily living.  For example, while B.G.S.'s grades varied from semester to semester, the fact that he was periodically able to earn high and even excellent marks in math, science, geography, English, and social studies and stay on grade level reflects an ability to acquire and use information and to attend and complete tasks.  (Id. at 156, 158-59, 167).  Likewise, although B.G.S.'s mother reported that he has trouble getting along with teachers, playing team sports, understanding, carrying out, and remembering simple instructions, understanding stories in books, studying and doing homework, accepting criticism or correction, keeping out of trouble, obeying rules, avoiding accidents, finishing things he starts, and completing homework and chores (id. at 131-34), she also reported that he can take care of personal hygiene, wash and put away his clothes, help around the house, get to school on time, take needed medication, use public transportation by himself, ask for help when needed, answer and talk on the telephone, read and understand sentences, spell words of more than four letters, tell time, add and subtract numbers over ten, multiply and divide numbers over ten, make correct change, make friends, get along with adults and siblings, and keep busy on his own.  (Id. at 130-34).  In the most recent medical entry in the record dated July 7, 2009, an attending psychiatrist at SAMH noted that "[B.G.S.] continues to grow appropriately.  His mom says he has a better attitude and has been more respectful so she never had to start Lexapro."  (Id.  at 336).  This evidence, as well as the evidence set forth above, is inconsistent with Dr. West's opinion that B.G.S. has a "marked" limitation in his ability to acquire and use information and to attend and complete tasks.

As discussed above, the ALJ articulated specific reasons for declining to give controlling weight to Dr. West's opinion.  (Tr. at 22).  In addition, the ALJ articulated specific reasons for assigning significant weight to the opinions of consultative examining psychologist Dr. Brantley and non-examining[26] State Agency medical and psychological consultants, Francis W. Sullivan, M.D., and Donald Hinton, Ph.D., stating that their opinions were consistent with the other credible record evidence.  (Id.).

When an ALJ articulates specific reasons for declining to give a treating physician's opinion controlling weight, and the reasons are supported by substantial evidence, there is no reversible error.  See Forrester v. Commissioner of Social Sec., 455 Fed. Appx. 899, 902 (11th Cir. 2012) (unpublished).  Indeed, an ALJ "may reject any medical opinion, if the evidence supports a contrary finding."  Id., 455 Fed. Appx. at 901.  Moreover, an ALJ may rely upon and credit the opinions of non-treating sources over those of a treating physician if the evidence supports the opinions of the non-treating sources but not the opinions of the treating physician. Id., 455 Fed. Appx. at 902.  Having reviewed the ALJ's analysis and all of the evidence in this case, the Court finds that the ALJ did not err by not according controlling weight to the opinions expressed in Dr. West's childhood disability evaluation dated January 16, 2008.  Indeed, substantial evidence, including the treatment records of Dr. West, the evaluation by Dr. Brantley, and the SAMH records, support the ALJ's determination that B.G.S. does not meet or equal a

---

[26] Defendant is correct that the ALJ was "required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.'"  Milner v. Barnhart, 275 Fed. Appx. 947, 948 (11th Cir. 2008) (unpublished) (quoting 20 C.F.R. § 404.1527(f)(2)(i)).  "The ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources."  Id.  In this case, the opinions of non-examining medical and psychological consultants, Drs. Sullivan and Hinton, were supported by substantial evidence in the record, including Dr. West's treatment records, B.G.S.'s school records, and the opinions and conclusions of consultative psychologist, Dr. Brantley.

listing and does not have marked limitations in at least two domains or an extreme limitation in one domain so as to functionally equal a listing. (Tr. at 23, 31). Thus, B.G.S. is not disabled under the Act.

**V.**      **Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for supplemental security income, be **AFFIRMED.**

**DONE** this **13th** day of **March, 2013.**

_____/s/  SONJA F. BIVINS_____
**UNITED STATES MAGISTRATE JUDGE**